E-FILED
Wednesday, 10 March, 2010  03:37:27 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

Cheryl L. Bassett,                          )
                    Plaintiff               )
                                            )
        v.                                  )            Case No. 07-1172
                                            )
John E. Potter, Postmaster General of the   )
United States Postal Service,               )
                    Defendant               )

## OPINION

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the court is Defendant's Motion for Summary Judgment (#11). The motion is fully briefed and I have carefully considered the submissions and arguments of the parties. As explained herein, the motion is granted.

## JURISDICTION AND VENUE

This case was brought pursuant to the Rehabilitation Act (the "Act"), 29 U.S.C. §621 et seq.[1] This Court therefore has federal question jurisdiction. 28 U.S.C. §1331.

The events in this lawsuit took place at Plaintiff's place of employment, which was the Post Office in Pekin, Tazewell County, Illinois. Venue is therefore proper in this District, 28 U.S.C. § 1391(e)(2), and in this Division. CDIL-LR 40.1

---

[1] The original complaint included a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. The parties have stipulated to the dismissal of that claim. See Stipulation (Doc. #10).

## SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1016 (7th Cir.2000); Cox v. Acme Health Serv., 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994). Summary judgment is not a substitute for a jury's determination about credibility. Paz v. Wauconda Healthcare and Rehabilitations Centre, 464 F.3d 659, 664 (7th Cir. 2006). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, Erdman v. City of Ft. Atkinson, 84 F.3d 960, 961 (7th Cir. 1996); Vukadinovich v. Bd. of Sch. Trustees, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir. 1990); DeValk Lincoln-Mercury, Inc. V. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987); Bartman v. Allis Chalmers Corp., 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party. Adickes v. S.H. Kress & Co., 398 U.S.

144 (1970); Trotter v. Anderson, 417 F.2d 1191 (7th Cir. 1969); Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 497 (7th Cir.1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 532 (7th Cir.1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., Jordan v. Summers, 205 F.3d 337, 342 (7th Cir.2000).

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995), citing Anderson, 477 U.S. at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

Although courts weighing summary judgment motions in employment cases must take special care not to invade the province of the fact finder, employment cases are governed by the same rules that govern any other summary judgment case, and they are equally amenable to summary disposition so long as there is no genuine dispute as to material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997); Gonzalez v. Ingersoll Milling Machine Co., 133 F.3d 1025, 1031 (7th Cir. 1998). While intent and credibility are often critical issues in employment discrimination cases, there is no special version of Rule 56 that applies only to them.

3

See, e.g., <u>Alexander v. Wisconsin Dep't of Health and Family Serv.</u>, 263 F.3d 673, 681 (7th Cir.2001); <u>Wallace v. SMC Pneumatics, Inc.</u>, 103 F.3d 1394, 1396 (7th Cir.1997); <u>Haugerud v. Amery School Dist.</u>, 259 F.3d 678, 689 (7th Cir.2001).

**STATEMENT OF UNDISPUTED FACTS**

The following statement of undisputed facts is taken from the parties' statements of fact, the responses and replies thereto, and the evidence submitted in support thereof.

Cheryl Bassett was employed by the United States Postal Service. Beginning in June of 1996, she worked as a data conversion operator at the Remote Encoding Center located at the Peoria Airport. Her duties initially were to type a coded delivery sequence via computer on incoming mail so it could be automatically sorted for delivery to proper destinations. Later, she was a group leader, which involved more supervision and coordination and less data entry. In May of 2005, Bassett received notice that the Remote Encoding Center would be closing and her job would be terminated.

Originally, the plan was to transfer Bassett to a mail processing position in Champaign, Illinois. Because of her seniority, however, she had the opportunity to bid on other jobs. She applied for a position as a mail carrier in her hometown of Pekin, Illinois. As part of her application, she signed Falsification and Postal Crime Affidavit, which included the following:

> I am also aware that the Postal Service has the authority to terminate my employment at any time should it determine that I have falsified any information contained in my application for employment or this affidavit in support thereof.

(Exh. B to Defendant's Motion for Summary Judgment, Doc. #24 p.34).

The Postal Service requires all applicants for the position of mail carrier to submit to a physical examination. As part of that examination, a Medical Examination of Assessment (PS form 2485) is completed. The Postal Service fills out the first two sections of which set forth the

4

functional requirements and environmental factors involved in the position. Those sections reveal that the essential functions of a mail carrier include a number of physical activities, such as being able to lift 70 pounds, reach above the shoulders, use the fingers, stand or walk for 8-10 hours, bend and climb, operate a motor vehicle, all in excessive heat, cold, humidity and dampness.

The remainder of the Assessment Form is filled out by the applicant. The introductory paragraph to these sections reads, in pertinent part, as follows:

> This section contains questions regarding your medical history and health habits. This information will be used to make a medical assessment of whether you can safely and efficiently perform the duties of the position that you now hold or for which you have applied ... It is essential that you answer all questions truthfully and completely. A history of any health problems will not necessarily disqualify you from employment. False or incomplete response could result in an incomplete examination, or termination if hired.

On September 25, 2005, Bassett was examined by a physician at Proctor First Care in Peoria, Illinois. The physician had access to the Assessment Form completed by Bassett and the Postal Service. After the doctor completed an initial exam and reviewed the history form, he determined that Bassett was medically qualified to perform the essential functions of a letter carrier without need for accommodation or further medical review.

Bassett was approved for the mail carrier position, and on October 1, 2005, she began work as a part time flexible carrier at the Pekin Post Office. Her supervisors were Sue Buckley[2] and Angela Heron. Their supervisor was the Acting Postmaster of the Pekin post office, John Crain. Bassett was given some in-house training. At the end of the second week or beginning of the third week in October, she began to carry mail for her routes.

---

[2]Buckley has filed an Affidavit (Doc. #33-2) which includes information regarding the circumstances under which she resigned her position at the Postal Service sometime in 2006. Those circumstances are immaterial to the issues before this court, because they relate solely to issues of credibility of a witness, an issue which cannot be resolved on summary judgment.

On either her first or second day, as she headed out to deliver mail, Crain said to her," Are you sure you are ready to do this?" Bassett replied in the affirmative. According to Buckley, Crain was critical of the length of time Bassett took to learn and to perform her duties, calling her a poor performer. Bassett believed that Crain's tone when he spoke to her was condescending. She also felt that Crain scrutinized her more than he did younger employees. She therefore maintained that she worked through pain to "show him I could do the job."

During her second week of delivering mail, Bassett began experiencing pain in her legs. Her supervisors noticed that she was walking slowly and limping. On October 29, Buckley told Bassett that she needed to be seen by a doctor before she would be allowed to continue to deliver mail. Bassett saw her physician on October 31. He referred her to an orthopedic surgeon. On Nov. 1, the orthopedic surgeon diagnosed stress fractures in both ankles. Her ankles were cast and she was told that her ankles should not be weight bearing. She was confined to a wheelchair until the casts were removed on January 5, 2006.

According to Buckley, when an employee was injured, she was required to follow Post Office policy and practice as to workplace injuries. Buckley characterizes this "policy and practice" as a search "for ways to discipline and terminate the employment of injured employees to avoid another injury and limited duty from any injury." She was given an Accident Report kit, which included a Safety Accident Report. She claims that she was told by her supervisor that every workplace injury is preventable and that such injuries cannot simply be attributed to "an accident." Buckley states that she was required in all but rarest cases to find a safety violation. (Buckley Affidavit Doc. #33-2, ¶ 6-

7)[3]. Buckley also states that Bassett was the only employee of whom she was aware who had filed for workers' compensation benefits and then subjected to a medical fraud review.

In December, before the casts were removed, it appeared that there was a possibility that Bassett could transfer into a clerk position. That possibility did not materialize, because clerks were in a different union than Bassett was.

In February 2006, Bassett applied for workers compensation based on these injuries. The Postal Service requested that Autrill Cook, a Human Resource Specialist within the Injury Compensation Unit of the Postal Service, investigate Bassett's employment and medical history. Clark contacted Dr. Elaine Furgeson, who is the Senior Medical Director for the Great Lakes area of the Postal Service.

Dr. Furgeson obtained copies of Bassett's medical records from her physicians and compared those records to the Medical Examination and Assessment Form that Bassett had completed in September of 2005, when she applied for the mail carrier position. That examination revealed that Bassett had been less than forthcoming with respect to the answers she provided to some of the 98 questions on the Assessment Form. Discrepancies identified by Dr. Furgeson, along with Basset's subsequent interpretation of those discrepancies, included:

1.    The Form asked: "Have you ever required special or restricted job assignments due to illness, injury or physical impairments? If yes, list accommodations provided." Bassett placed an "x" in the "no" column.

---

[3]Buckley's Affidavit contains information about the Department of Labor's practices regarding workers' compensation claims and about the Union's general opposition to an employee's signing of medical release forms. Neither of these topics is relevant to the discussion. Bassett apparently did sign medical release forms, which resulted in her medical file being available for review. What might hypothetically happen under other circumstances - if, for example no release were signed - sheds no light on the facts before the Court.

In fact, Bassett had worked with restrictions at the Postal Encoding center; her typing was limited to 5 hours per day in 2 hour segments with a minimum of 1 hour between segments, beginning January 13, 2004 and continuing "indefinitely." Her physician's notes indicate that, on March 31, 2004, Bassett came into his office seeking a "work restriction at the post office as before."

Bassett explained that she had forgotten about this when she filled out the Form. In addition, in her Rule 56 Affidavit, Bassett explains that her position as Group Leader at the Encoding Center required minimal typing, never more than 4 hours per day in 2 hour segments, and no standing at all. She viewed her physician's limitations on typing and standing as not affecting her job duties at the Encoding Center and believes that her answer to this question was correct.

2. The Form asked if she had ever had a cancerous tumor or cyst. Bassett marked an "x" in the "no" column.

Bassett's medical records, however, showed that Bassett had skin cancer removed from her forehead and nose in 1994.

Bassett testified that excision of the cancer was performed in 1994, and she has had no recurrence since then. She also argues that, because this type of cancer is completely curable, her failure to disclose it was harmless.

3. The Form asked Bassett if she ever suffered from painful or swollen joints. Bassett marked an "x" in the "no" column.

On April 13, 2004, Bassett was seen for a follow up for osteoarthritis (OA) in her fingers and knees. The medication she was taking was providing little relief and she wanted it changed. On January 13, 2004, Bassett was seen for a follow up for Raynaud's Syndrome[4] and "fibromyalgia type complaints with total body muscular aching in lower legs, upper legs, back, shoulders and arms as well as hand discomfort." These symptoms were worse in the winter. She was also suffering from some leg dema[5] which was "usually worse after 3 mile hike in the morning."

Bassett admits that she experienced circulatory problems in her hands and feet associated with Reaynaud's disease, although she claimed never to have missed work because of it. She took medication for 6 months or less for this condition. She also admitted that walking 3 miles caused her legs to swell, that she was treated for pain

---

[4]According to the National Institute of Health website, Raynaud's is a condition in which cold temperatures or strong emotions cause blood vessel spasms that block blood flow to the fingers, toes, ears, and nose. www.nim.nih.gov/medlineplus. It causes affected areas of the body to feel numb and cool. www.mayoclinic.com/raynaud's disease/definition

[5]According to the National Institute of Health website, leg dema is also known as peripheral edema and means swelling of the ankles, feet and/or legs. www.nim.nih.gov/medlineplus.

in her upper legs, back, shoulders and hands. Bassett explains that "I'm old. I have joint pain."

4.   The Form asked if she had ever had "stiffness of neck," to which she answered "no."

In March 2004, one of her medical records showed that she was seen for a red lump on the back of her neck and for pain radiating down to her left shoulder. Several days later, she called the doctor for stronger medication for back pain. She testified that the call was actually for stronger medication for the same neck pain. At a follow up visit, Bassett complained of a "grinding pain" in her neck. She was placed on several medications for pain and anti-inflamation as well as a muscle relaxer. She also sought a work restriction because of her neck pain.

Bassett testified that she could not remember going to the doctor for neck pain but that it could have been caused by looking at the computer screen.

5.   The Form asked Bassett if she has or ever had arthritis. Bassett marked an "x" in the "no" column.

In 2004, Bassett was treated for osteoarthritis in her neck, fingers and knee. She was placed on medication. At a follow up visit, she asked to change that medication.

6.   The Form asked if Bassett has or ever had a back injury or abnormality. Bassett marked an "x" in the "no" column.

In February 2006, Bassett was seen for evaluation of back pain symptoms. The medical notes state that she has chronic "boring back pain."

7.   The Form asked if Bassett ever had any chronic sinus trouble. Bassett marked an "x" in the "no" column.

In March 2004, Bassett scheduled an appointment for sinusitus. The medical records indicates that she had symptoms for the last week and that her sinusities seems to be chronic. At the time, she was experiencing sinus congestion, rhinorrhea, sore throat, and cough. Bassett testified that she does not believe she has sinus trouble because it does not prevent her from going about daily activities.

8.   The Form concluded by asking if she had ever had any illness or injury other than those listed above. Bassett marked an "x" in the "no" column.

Bassett's medical history refers to a variety of other injuries and illnesses. She began taking Fosamax in 2005, as a result of what one physician called a history of "severe osteoporosis," and osteopenia (milder form of bone thinning) of the hip. These conditions were first suggested in a medical report of December 2004, when the physician stated that she has a "high probability of osteoporosis."

In 2004 she was seen for fatigue and strange sensations in her leg. The leg sensations were attributed to neuropathy. In the late 1980's and early 1990's she was treated for respiratory problems.

9

Based on her review of Bassett's medical records, Dr. Furgeson wrote a memorandum entitled "Cheryl Bassett Medical Fraud Review Summary 3/23/06." The report detailed the above inconsistencies. Dr. Furgeson forwarded her report to the Labor Relations department of the Postal Service.

Shortly before that report was submitted, Bassett's orthopedist released her to work light duty but no such position was then available. On April 17, 2006, she was released to work without restrictions. On April 21, Crain telephoned her to let her know she could come back either on April 22 or April 23. When she came back to work, she was assigned to deliver a full route, to help on another route, and to collect mail at various locations. The record contains no information about any remarks or negative comments that came from Crain or Heron during the initial few days that Bassett returned to work.

That changed, however, on April 27,2006. Crain told Bassett that he had received additional information regarding her medical history and that, based on that information, he was placing her on paid administrative leave. That information was, of course, Dr. Ferguson's Medical Fraud Review. Crain then conducted his own investigation into that Review, by reviewing the medical records to verify Dr. Ferguson's conclusions. He also tried to interview Bassett.

On May 4, 2006, Bassett and her union representative met with Crain and Herron. Crain told her that she had submitted false information when she applied for the letter carrier position. On the advice of her union representative, she declined to answer questions. At a later meeting on May 18, she was allowed to answer questions in writing, and on May 24, she did so. In her answers, she stated:

1.      She was diagnosed and/or treated for skin cancer but her treatment was not continuing as she does not have melanoma.

10

2. She was diagnosed with Raynaud's but did not receive treatment. She experienced pain and tingling in her fingertips.

3. She did not remember being diagnosed with cervical osteoarthritis.

4. She had been treated for neck pain but was not currently under treatment. She did not think about it as it was a sudden onset in March 2004 but required no further treatment.

5. Despite entries in her medical history to the contrary, she denied being treated for back pain.

6. Although she received a bone density scan, her doctor never told her she had ostopenia or osteoporosis, although he did recommend she start on Fosomax after the bone scan.

7. She admitted to having medical restrictions in performing her typing at the Encoding Center but stated that it only related to the pain in her fingertips from Raynaud's.

8. She did talk to her doctor about joint pain, but only in relation to two conditions that she revealed on the Form, namely hypothyroidism and estrogen deficiency.

9. All the information she submitted on the Form was true to the best of her knowledge and belief.

Based on these responses as well as his own review of Dr. Ferguson's report, Crain concluded that Bassett had knowingly made false statements regarding her application for employment. He received input from Angela Herron, who was Bassett's direct supervisor, and from Steve Grieser, the Labor Relations Specialist, but it was Crain who decided to terminate Bassett's employment. On June 10, 2006, Bassett was given a Notice of Removal Letter dated June 2, 2006. The letter stated the basis for termination was providing false or incomplete information on the Form.

Bassett filed suit, alleging that Defendant "terminated Plaintiff's employment by reason of her record of a disability, because Plaintiff was regarded as disabled, or her disability contrary to the Rehabilitation Act of 1973, 29 U.S.C. § 794a." (Complaint, paragraph 21). She seeks damages for lost wages and benefits, mental distress, and pain and suffering.

Defendant has filed its motion for summary judgment, arguing that Bassett has not met her burden as to any one of the three permutations of a claim under the Act. Plaintiff responds, however, that she "rests her claim of disability on the 'regarded as' element." (Response, Doc. #28, p.24). In

11

other words, Plaintiff no longer asserts that she was actually disabled or that she had a record of disability, and it is unnecessary to analyze those types of claims. This Order is limited to an analysis of the "regarded as" type of claim, the only remaining claim.

### DISCUSSION

The Rehabilitation Act and the Americans with Disabilities Act, were significantly amended, effective January 1, 2009. ADA Amendments Act of 2008, Publ L. No. 210-325 (2008). Within those amendments, Congress expressed no intent that the amendments be effective retroactively. The Seventh Circuit has held that, in the absence of such intent, the law in place prior to the amendments governs cases that pre-date the amendments. Fredricksen v. UPS, 581 F.3d 516, 521 n.1 (7th Cir. 2009). This Order therefore applies the statute, regulations and case law that governed prior to the amendments.

The standards that apply in Rehabilitation Act cases are the same standards that apply in cases under the Americans with Disabilities Act ("ADA"). Cases under the ADA are therefore properly cited in Rehabilitation Act cases. 29 U.S.C. § 794(d); see, Silk v. City of Chicago, 194 F.3d 788, 798 n. 7 (7th Cir. 1999).

The Rehabilitation Act provides a private right of action for federal employees alleging employment discrimination based on a disability. 29 U.S.C. § 794(a). To establish a prima facie case of discrimination under the Rehabilitation Act (herein, the "Act"), Bassett must come forward with evidence in support of the following elements: (1) she suffers from a disability as defined in the Act; (2) she is qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she has suffered an adverse employment decision because of her disability.

If she has no direct evidence, she may proceed under the burden shifting method set out in McDonnell Douglas v. Green, 411 U.S. 792 (1973). Robin v. Espo Engineering Corp., 200 F.3d 1081, 1089 (7th Cir. 2000). Under the burden shifting method, if she establishes a prima facie case, a rebuttable presumption of discrimination arises. The employer must then articulate a "legitimate, non-discriminatory reason for the adverse employment action." Cianci v. Pettibone Corp., 152 F.3d 723, 726 (7th Cir. 1998). If the employer provides such a reason the plaintiff must then show that the reason was merely pretext for discrimination.

A plaintiff bears the burden of proving the first element, namely that she is disabled. Winfrey v. City of Chicago, 259 F.3d 610, 614 (7th Cir. 2001). The Act defines "disability" as:

    A.    a physical or mental impairment that substantially limits one or more of her major life activities;

    B.    a record of such a disability; or

    C.    being regarded as having such an impairment.

29 U.S.C. 705(20)(B). See, Duncan v. Wis. Dep't of Health & Family Services, 166 F.3d 930, 935 (7th Cir. 1990). As mentioned above, Bassett is proceeding under the third definition of disability.

Under the "regarded as" prong, a plaintiff may prove she is disabled by showing either: 1) that the employer mistakenly believes she has a physical impairment that substantially limits a major life activity; or 2) that the employer mistakenly believes that an actual, non-limiting impairment substantially limits a major life activity. Peters v. City of Mauston, 311 F.3d 835, 843 -844 (7th Cir.2002); citing Amadio v. Ford Motor Co., 238 F.3d 919, 925 (7th Cir.2001); and Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, (1999); see also 29 C.F.R. § 1630.2(1). In other words, the employer "must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."

Sutton, 527 U.S. at 489; see also Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944, 954 (7th Cir. 2000). In this case it is the second "regarded as" claim, namely that Bassett had a substantially limiting impairment when, in fact, the impairment was not so limiting

So it is not enough for Bassett to show that the Postal Service was aware of her impairment; she must also show that the Postal Service believed that she was substantially limited because of it. See, Skorup v. Modern Door Corp.,153 F.3d 512, 515 (7th Cir.1998). Conversely, if the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the Act under the "regarded as" prong of the statute. Mack v. Great Dane Trailers, 308 F.3d 776, 781-782 (7th Cir.2002).

The question, therefore, is whether the Postal Service perceived Bassett's impairment - her stress fractures[6] - to be sufficiently severe to substantially limit a major life activity. In this case, the life activities in question have been identified by Plaintiff as walking and lifting[7]. (Plaintiff's Response, Doc. #38 p.29). This means that the Postal Service must have mistakenly believed Bassett was either (1) unable to walk; or (2) significantly restricted as to the condition, manner or duration under which she could walk, as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). See, Contreras v. Suncast Corp., 237 F.3d 756, 762 (7th Cir.2001).

---

[6]Plaintiff's Response states (p.28) that Plaintiff's supervisor Crain regarded her as disabled "because her age and then her disability from the stress fracture of her ankle and his belief it would have residual effects on her ability to walk without injury." There is no remaining issue as to age in this case. Any comments Crain may have made about Bassett's age or other age-related evidence will be disregarded as immaterial.

[7]There is a total dearth of evidence or argument regarding Bassett's ability to lift. The Court will therefore proceed as though the life activity in question was her ability to walk.

14

There are several problems with this element of Plaintiff's case. First, if one assumes that Crain viewed Bassett as significantly restricted in her ability to walk, it was not a *mistaken* perception. It was accurately based on her history as a mail carrier, which showed stress fractures after 2 weeks of walking her route, and ultimately on her medical records, which showed she was unable to walk more than 3 hours without swelling in her ankles.

Second, and most important, however, there is no admissible evidence at all that Crain perceived Bassett as unable to walk or significantly restricted in her ability to walk. . Other than his "condescending tone," which Bassett has not associated with any disability-related comment or conduct, Bassett herself offers no evidence of such a perception. She was hired in the first instance, and, after her injury when she was released to return to work without restriction, Crain placed her on a route delivering mail. If he had perceived her wholly unable to walk or significantly limiting in doing so, he certainly would not have done so.

What has Plaintiff produced to suggest that Crain believed she was significantly restricted in her walking? First she relies on Buckley's Affidavit, which states as follows:

> At the outset of Cheryl Bassett's employment as a letter carrier in 2005, Cheryl Bassett was struggling to learn the job. John Crain told me he did not believe she could do the job of a letter carrier because of her age. The mention of age and her ability to do the job referred to Cheryl Bassett's physical ability. That was my interpretation of what Crain said. The letter carrier job required the employee to do the physical activities of walking, and lifting."

There is no age discrimination claim in this case, and the quoted statement contains nothing at all about physical disability. It is merely Buckley's conjecture about what Crain meant when he made the statement. This is not evidence; it would be rank speculation for the Court to infer that Crain was referring to physical limitations on walking when all he mentioned was age. Inferences supported

15

only by speculation or conjecture do not suffice to create a triable issue. <u>Petts v. Rockledge Furniture</u>, 534 F.3d 715 (7th Cir.2008); <u>McDonald v. Vill. of Winnetka</u>, 371 F.3d 992, 1001 (7th Cir. 2004).

Moreover, the quoted statement is nothing but a single, stray comment. "To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge-making process." <u>Geier v.Medtronic, Inc.</u>, 99 F.3d 238, 242 (7th Cir. 1996). If such proof is lacking, "the remarks alone will not give rise to an inference of discrimination even when uttered by the decision-maker." <u>McCarthy v. Kemper Life Ins. Co.</u>, 924 F.2d 683, 686-87 (7th Cir. 1991). This remark was allegedly made at the beginning of Plaintiff's employment as a mail carrier, in October of 2005, before any injury at all. There is neither temporal nor causal relationship between the statement and Plaintiff's termination months later. To attribute a discriminatory motive to Crain based on this statement would be error.

Plaintiff next opines that the practice of the Postal Service was to get rid of employees who are injured on the job. Plaintiff herself has no personal knowledge of this practice. She relies completely on Buckley's Affidavit to support this opinion, but Buckley's Affidavit is of no assistance to her. The only personal knowledge Buckley asserts is that she was required to fill out an accident report when an employee under her supervision was injured; the balance of her Affidavit is either

immaterial or inadmissible for lack of personal knowledge.[8] Filling out an accident report is hardly the stuff of discrimination.

Plaintiff (once again, through Buckley's Affidavit) also suggests that there was some anti-union sentiment in the Postal Service's obtaining Bassett's consent for release of her medical records. Opinions regarding the union or conflicts between a union and an employer have nothing whatsoever to do with disability discrimination. Bassett did in fact sign the release, and her after-the-fact wish that she had not done so is of no assistance to her now. (See note 6 above).

I therefore conclude that Bassett has failed to sustain her burden of producing evidence to support an element on which she bears the burden of proof, namely that she was disabled under the Act. Even if I were to conclude, however, that Bassett's evidence was sufficient to raise a question of fact about whether she was regarded as disabled, I would nonetheless grant the Defendant's motion because Plaintiff has failed to establish a question of fact with respect to whether she was a "qualified individual."

---

[8]Nowhere in Buckley's Affidavit (or anywhere else in the record) is the Court informed exactly when Buckley retired. This omission is troubling, especially in light of Bassett's reliance on Buckley's description of the practice of her managers. If she retired before Bassett's return to work in late April 2006, as this artfully pleaded affidavit makes it appear, then Buckley has no personal knowledge of how managers handled Bassett's workers' compensation claim or the review of her medical history. Her statements are general (e.g., Bassett "*probably* had signed medical information authorization forms", ¶ 9, ), and entirely absent from the Affidavit is any basis for the assertion of personal knowledge about Bassett's situation after her return to work. Moreover, there is nothing in the Affidavit that provides any foundation for her statements about fraud reviews of other employees. I find that this portion of Buckley's Affidavit (from p.2 ¶ 7 through the end) is inadmissible under Fed.R.Civ.P. 54(e)(1)[affidavits must be made on personal knowledge and must "show that the affiant is competent to testify on the matters stated]., and the statements contained therein will not be considered by the Court in resolving this motion.

The Rehabilitation Act acknowledges the reality that a disabled person is otherwise qualified to do a job only if she can perform the essential functions of the position (with or without accommodation) without endangering the health and safety of herself or others. See, 29 C.F.R. § 1613.702(f); Southeastern Community College v. Davis, 442 U.S. 397, 406, 407 n.7 (1979). The Postal Service had every reason to be concerned about Bassett's physical ability to perform the job duties of a mail carrier. The position involved significant physical exertion and stamina. Concern with safety had been expressed to job applicant Bassett from the very beginning, and the fact that the concern reappeared after her injury is not evidence of discrimination, not under the facts of this case. Plaintiff has produced no evidence at all that the Postal Service's concern with Bassett's physical capability to perform essential functions of the job is somehow discriminatory. She also has not produced any evidence that she would have been able to perform those functions in the long term.

Finally, even if I were to find that plaintiff was a qualified individual with a disability, she has utterly failed to show the existence of any question of fact with respect to pretext. "Pretext" is more than an error; it is a dishonest explanation or a lie; it is a "phony excuse." Faas v. Sears Roebuck and Co., 532 F.3d 633, 642 (7th Cir. 2008). "Showing pretext requires proof that the defendant's explanation is unworthy of credence." Filar v. Bd. of Educ. of the City of Chicago, 526 F.3d 1054, 1063 (7th Cir. 2008).

To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action. McNabola v. Chicago Transit Auth., 10 F.3d 501, 513 (7th Cir.1993). A

plaintiff's speculation is insufficient to establish pretext. See, <u>Hudson v Wal-Mart Stores, Inc.</u>, 412 F.3d 781, 786 (7th Cir. 2005).

The Postal Service's explanation for Bassett's dismissal was that she lied on her medical history questionnaire when applying for the position of mail carrier. Plaintiff challenges the articulated reason in several ways, none of them valid.

She primarily argues that her "misrepresentations" were all minor and of no consequence. I disagree with such a characterization. The misrepresentations were far from immaterial. They related to her ability to work in extreme temperatures and to walk 3 miles without swelling joints. Her back and neck disorders were relatively frequent and recent, and such disorders would be pertinent to the decision whether to hire a person for a job requiring walking and lifting. Her failure to acknowledge prior work restrictions cast doubt on her honesty.

Moreover, the application process included statements on both the Affidavit and on the Assessment Form about the consequences of incomplete or untruthful answers. The Assessment form did not ask Bassett to list only medical conditions and restrictions that might be "relevant" to the position; it asked for "complete" answers. Clearly the stated reason was sufficient to justify the adverse employment action.

I also note that lying to an employer on an application for employment or on other employment related documents is a valid reason for discharge, even if the employee is disabled. In <u>Spath v. Hayes Wheels Intern'l</u>, 211 F.3d 392 (7th Cir. 2000), for example, a mentally disabled employee lied about how workplace accident occurred. A company rule provided that falsifying an employment application or giving false information relating to employment or benefit application was grounds for discipline up to and including discharge. The Seventh Circuit held that his dismissal did

not violate the ADA. See also, <u>Budde v. Kane County Forest Preserve</u>, - F.3d - , No. 09-2040, 2010 WL 724140, March 4, 2010 (7th Cir.)(violation of a reasonable workplace rule is not a defense to discipline, up to and including termination); <u>Pernice v. City of Chicgo</u>, 237 F.3d 783 (7th Cir. 2001); <u>Hudson v. Wal-Mart Stores, Inc.</u>, 412 F.3d 781 (7th Cir. 2005); <u>Palmer v. Circuit Court of Cook County</u>, 117 F.3d 351, 352 (7th Cir. 1997).

Bassett's failure to truthfully and completely present information about her medical history was sufficient to justify termination. The Act does not protect employees from the consequences of their own conduct.

Second, she challenges the motivation for the review of her medical records, claiming it was nothing more than "a way to see if there was a reason to discipline and terminate the employment her [sic] to avoid another injury and limited duty from any injury." As mentioned above, however, this is Bassett's opinion, not a fact, and her opinion is supported only by Buckley's opinion, as stated in her Affidavit, which is inadmissible on this point. There is no other evidence to support this speculation.

Plaintiff next argues that a discriminatory purpose should be inferred from the fact that the Postal Service conducted an "unprecedented" fraud investigation after her injury. First of all, that language mis-characterizes the investigation. Initially, Dr. Ferguson was asked to investigate the cause of Bassett's injury in light of the fact that it had occurred so soon after she began her job duties. It was only after her medical records were reviewed that the situation was viewed as fraud.

More importantly, however, given not only the temporal proximity between the start of her job performance and her injury, but also the severity of Plaintiff's injuries (which initially rendered her wheelchair bound and which kept her off work for months), there is nothing surprising about the

20

fact that the employer wanted to assure itself that she had in fact been physically and medically qualified for her job. When a workplace injury impacts basic job qualifications - walking would fall into that category for a mail carrier - it is simply not discriminatory for an employer to verify physical capability, especially where, as here, the employee intends to return to work. In light of these facts, drawing an inference of discriminatory motive, without more, would be unreasonable. And there is nothing more here. There is no evidence from which I might conclude that there was any discriminatory motive in terminating plaintiff's employment for misrepresented her medical history on the questionnaire.

As a final note, the Seventh Circuit in Serwatka v. Rockwell Automation Inc., 591 F.3d 957 (7th Cir. 2010) held that the ADA requires "but for" causation in all cases where the conduct complained of occurred prior to the effective date of the ADA/Rehabilitation Act amendments, namely Jan. 1, 2010. In the case before this Court, all the relevant conduct predated the amendments, so but for causation is required. Plaintiff's heartfelt criticism of Serwatka notwithstanding, this Court is obliged to follow Serwatka. This case does not even approach but-for causation.

## CONCLUSION

For any one of these reasons, Plaintiff's claim fails. The Defendant's motion for summary [#11] judgment is granted. All dates are vacated, and this case is closed.

ENTERED ON March 10, 2010

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE